708 F.2d 365
 UNITED STATES of America, Plaintiff-Appellee,
v.
Esmail YERMIAN, Defendant-Appellant.
 No. 81-1192.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 3, 1982.
Decided April 19, 1983.
 
 Alan Zarky, Los Angeles, Cal., for defendant-appellant.
 Janet Goldstein, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before FLETCHER, PREGERSON and REINHARDT, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 Appellant Yermian was charged with violating 18 U.S.C. Sec. 1001 (1976).[1] At trial, Yermian's defense was simply that he did not know at the time he signed a personnel security form that it would be sent to the government. He appeals his conviction. Our jurisdiction rests on 28 U.S.C. Sec. 1291. We reverse the judgment and remand for a new trial because the trial court construed the scienter requirement of section 1001 too narrowly and gave the jury an inadequate instruction on that issue.
 
 
 2
 I. Facts.
 
 
 3
 Shortly after appellant Yermian was hired as an engineer by Galton Industries, Inc. (Galton) of Hawthorne, California, Galton asked Yermian to fill out a personnel security form. In filling out the form, Yermian provided the company with false information as to his job history and criminal record. At a later date, Galton presented Yermian with a typed version of the form, which Yermian signed, allegedly without carefully re-reading it. A notice at the bottom of the typed form warned that a false representation would be a violation of 18 U.S.C. Sec. 1001 and elaborated on the possible penalty for such a violation.
 
 
 4
 Galton subsequently sent the form to the Department of Defense, pursuant to a routine FBI security check necessitated by the nature of Galton's work. The FBI discovered that some of Yermian's statements were false and denied Yermian a security clearance. Confronted with the reasons for the denial of his security clearance, Yermian immediately conceded that he had lied.
 
 
 5
 II. Scienter Requirement of 18 U.S.C. Sec. 1001.
 
 
 6
 18 U.S.C. Sec. 1001 provides in part that "[w]hoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully ... makes any false ... statements" shall be fined or imprisoned. 18 U.S.C. Sec. 1001 (1976).[2]
 
 
 7
 The courts have long recognized that a conviction under section 1001 requires that the defendant know at the time he makes the statement that the statement is false, United States v. Lange, 528 F.2d 1280, 1288-89 (5th Cir.1976), and that the statement is made in a matter within the jurisdiction of a federal agency, United States v. Kraude, 467 F.2d 37, 38 (9th Cir.), cert. denied, 409 U.S. 1076, 93 S.Ct. 684, 34 L.Ed.2d 684 (1972); Lowe v. United States, 141 F.2d 1005, 1006 (5th Cir.1944).
 
 
 8
 Yermian concedes that he knew at the time he made the statement that it was false. He also concedes that since the process of checking the security status of the employees of a defense contractor is a matter within the jurisdiction of the Department of Defense and since his false statement regarding his prior employment history and criminal record was connected to that security-checking process, the statement was made in a matter within the jurisdiction of a federal agency. He asserts, however, that at the time he made the admittedly false statement he had no idea that the statement was part of a federal security-checking process and hence had no knowledge that the statement was made in a matter within the jurisdiction of a federal agency. He contends that he had no knowledge that Galton was required to submit information regarding the security status of its employees to the federal government and that Galton's submission to the FBI of the information Yermian had provided was entirely unexpected by him.
 
 
 9
 Hence, we must decide whether the element of specific intent embodied in the words "knowingly and willfully" of section 1001 includes not only the defendant's knowledge of the statement's falsity, but also the defendant's knowledge that the statement, at the time it was made, was made in a matter within the jurisdiction of a federal agency.
 
 
 10
 No decision in this circuit has addressed the precise question raised here.[3] In United States v. Cella, 568 F.2d 1266, 1288 (9th Cir.1978), the defendant contended the evidence was insufficient to show that he knew that his false statement was made in a matter within the jurisdiction of a federal agency. We sustained the conviction, on the basis that it was beyond credulity that the defendant, who was the administrator of Mercy Hospital, could be "ignorant" of the fact that his false entries on hospital records "would eventually be used to prepare income tax returns ... and Medicare reimbursement reports." There was also direct evidence of the defendant's knowledge. In Cella we assumed, without holding, that an element of the offense was knowledge of federal involvement.
 
 
 11
 In sustaining convictions under section 1001, the Second and Eighth circuits have apparently made the same assumption, stressing in their opinions the fact that the defendant had actual knowledge that his false statement was made in a matter within the jurisdiction of a federal agency. E.g., United States v. Candella, 487 F.2d 1223, 1226-27 (2d Cir.1973) (defendant "was aware" that his false statements submitted to New York City would form basis for federal reimbursement), cert. denied, 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 872 (1974); Ebeling v. United States, 248 F.2d 429, 434-35 (8th Cir.) (defendant employee personally knew and intended that false invoices would become part of a cost statement submitted to federal government by employer for reimbursement), cert. denied, 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 261 (1957).
 
 
 12
 By contrast, courts in the Fifth, Sixth, and Seventh circuits have stated that the defendant's knowledge that a false statement is made in a matter within the jurisdiction of a federal agency is not a necessary element of section 1001. United States v. Baker, 626 F.2d 512, 516 (5th Cir.1980);[4] United States v. Stanford, 589 F.2d 285, 297 (7th Cir.1978), cert. denied, 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979); United States v. Lewis, 587 F.2d 854, 857 (6th Cir.1978) (per curiam). Each of those cases, however, involved a direct attempt by a defendant to obtain funds from a federal source by fraudulent means.
 
 
 13
 We are now confronted directly with the question whether the government must prove as an essential element of a section 1001 violation that at the time the defendant made the false statement he knew that the statement was made in a matter within the jurisdiction of a federal agency. In light of the paucity of analysis in the cases and the lack of direct authority in our circuit, we must look closely at the language of section 1001 and the policy and purposes underlying it to determine whether jurisdictional knowledge is an essential element of a section 1001 offense.
 
 
 14
 We find the language of the statute ambiguous, as did the court in Baker, 626 F.2d at 515. While the phrase "knowingly and willfully" clearly provides that specific intent is a crucial element of the offense, neither the grammatical construction nor the punctuation of the statute indicates whether the "knowingly and willfully" phrase modifies only the phrase "makes any false, fictitious or fraudulent statements" or the broader phrase "in any matter within the jurisdiction of any department or agency of the United States ... makes any false, fictitious or fraudulent statements."
 
 
 15
 The placement of the "knowingly and willfully" phrase after, rather than before, the "jurisdiction phrase" is not indicative of whether jurisdictional knowledge is an element of the section 1001 offense. In the immediate statutory predecessor to section 1001, the words "knowingly and willfully" did precede not only the phrase "make ... any false or fraudulent statements" but also the phrase "in any matter within the jurisdiction of any department or agency of the United States." Act of Apr. 4, 1938, ch. 69, 52 Stat. 197 (the "1938 Act").[5] The recodification of the 1938 Act in 1948, that resulted in the present language of section 1001, was intended to be not a "substantive change," see United States v. Bramblett, 348 U.S. 503, 508, 75 S.Ct. 504, 507, 99 L.Ed. 594 (1954) (describing 1948 revision of the 1938 Act), but merely one of several "minor changes of phraseology." H.R.Rep. No. 304, 80th Cong., 1st Sess. A80-A81 (1947) reprinted in 1948 U.S.Code Cong.Serv., Spec. Pamphlet for Title Eighteen 2434, 2535. Consequently, the fact that the "jurisdiction" phrase now precedes the "knowingly and willfully" phrase is not determinative of whether or not the latter phrase was meant to be read to modify the "jurisdiction" phrase.[6]
 
 
 16
 Although perhaps not entirely conclusive, the legislative history of section 1001 and its predecessors supports the view that Congress intended jurisdictional knowledge to be an element of the crime.[7]
 
 
 17
 The earliest predecessor of the present section 1001 that made the making of a false statement in a matter within the jurisdiction of any federal agency[8] a crime, the Act of Oct. 23, 1918, ch. 194, 40 Stat. 1015 (the "1918 Act"),[9] specifically included an element of specific intent to defraud the United States. No one could be convicted under the 1918 Act for making a false statement unless he had done so either "for the purpose of obtaining ... the payment" of a "claim upon or against the Government of the United States" or "for the purpose and with the intent of cheating and swindling or defrauding the Government of the United States." 40 Stat. at 1015 (emphasis added). This requirement of specific intent to defraud the United States carried with it an implicit, if not explicit, requirement that the maker of the false statement know that the statement is made in a matter within the jurisdiction of a United States agency.
 
 
 18
 After the Supreme Court had narrowly construed the phrase "defrauding the Government of the United States" contained in the 1918 Act to mean solely "fraudulent[ly] causing ... [a] pecuniary or property loss" to the federal government, United States v. Cohn, 270 U.S. 339, 346-47, 46 S.Ct. 251, 253, 70 L.Ed. 616 (1925), Congress sought to extend the reach of the statute to protect more broadly "the authorized functions of governmental departments and agencies from the perversion which might result from ... deceptive practices." United States v. Gilliland, 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1940) (describing enactment of the Act of June 18, 1934, ch. 587, 48 Stat. 996 (the "1934 Act")).[10] To effect the change, Congress deleted the references to a "purpose" of obtaining payment of a claim upon or against the United States and to a "purpose" and "intent" of cheating or defrauding the United States. Id. However, to be sure that a conviction under the new law still required the making of a false statement in a matter within the jurisdiction of the federal government, Congress inserted a new reference to federal jurisdiction at the end of the description of the prohibited conduct.[11] United States v. Bramblett, 348 U.S. at 507-08, 75 S.Ct. at 507 (describing 1948 revision of the 1938 Act) ("jurisdiction" phrase inserted "simply to compensate for the deleted language as to purpose--to indicate that not all falsifications but only those made to government organs were reached").
 
 
 19
 The committee reports and the Congressional debates on the various bills[12] which culminated in the 1934 Act contain references to the act's broadening the offense to include the presentation of false papers "before any department or agency of the Government," H.R.Rep. 829, 73d Cong., 2d Sess. 2 (1934) (emphasis added) (report on H.R. 8046); to the protection of "[t]he rights of the accused" by a requirement that the "act [of presentation of a false written instrument relating to any matter within federal jurisdiction] must be committed willfully and knowingly," id; to the extension of the law so that it "would close around and prosecute those who ... make false affidavits or submit fictitious bids, and so forth," 78 Cong.Rec. 2859 (1934) (statement of Sen. Ashurst on S.R. 2686); to the "purpose" of the bill being to protect "the revenues of the people from persons who knowingly make false certificates and supply fictitious bids" and to stop "these grafters, place hunters, and obscene buzzards who are trying to extract money illegally out of the Treasury," id. at 2858; and to the printing of a warning about the law on "every proposal," id. at 3724 (statement of Rep. McKeown on H.R. 8046). These references indicate that the legislators contemplated application of the 1934 Act in situations where the maker of the statement knows that the statement is made in a matter within the jurisdiction of a federal agency. The fact that the amendment was directly designed to remedy two sorts of conduct in which the makers of false statements clearly know of Federal involvement--the presentation of "false papers" regarding hot oil before the Department of Interior and the use of false certificates of wages paid by contractors in order to obtain reimbursement from the Public Works Administration, S.Rep. No. 1202, 73d Cong., 2d Sess. 1 (1934) (report on H.R. 8912 amendments)--also supports the conclusion that Congress, in deleting from the statute the requirement of fraudulent intent to cause pecuniary loss, did not at the same time intend to eliminate the previous requirement that the maker know that the statement was made in a matter within the jurisdiction of a federal agency.
 
 
 20
 We conclude that Congress intended that knowledge of federal involvement be an element of the crime. We agree with the Baker court that "18 U.S.C. Sec. 1001 is designed to protect federal funds and functions from fraudulent interference." 626 F.2d at 516; see also United States v. Gilliland, 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1940). This is entirely consistent with the language of the statute and its history. But we do not subscribe to the view that "[i]n furthering these purposes, it is irrelevant whether defendant knew that his intentionally false statements might eventually influence a federal agency." Baker, 626 F.2d at 516 (emphasis added). To the contrary, the defendant's knowledge of federal involvement is entirely relevant to the proper effectuation of the Congressional goals, and a requirement of section 1001 that such knowledge exist is entirely consistent with the Congressional view of the scope of the statute as revealed by the statutory language and legislative history.
 
 
 21
 Accordingly, we hold that as an essential element of a section 1001 violation, the government must prove beyond a reasonable doubt[13] that the defendant knew at the time he made the false statement that it was made in a matter within the jurisdiction of a federal agency.[14]
 
 
 22
 III. Adequacy of Jury Instructions.
 
 
 23
 The government contends that even if knowledge of governmental involvement is an essential element of 18 U.S.C. Sec. 1001, the instruction given to the jury met that requirement. The jury was instructed that it could convict upon a finding "that the defendant knew or should have known that the information was to be submitted to the government" (emphasis added). The government argues that the instruction reflects a "reasonably foreseeable" standard and that this "objective" standard[15] is proper if knowledge that the statement is destined for the government is an element of the crime.
 
 
 24
 The standard proposed by the government, however, does not comport with the "subjective" standard of criminal knowledge required by this circuit. United States v. Jewell, 532 F.2d 697 (9th Cir.) (en banc), cert. denied, 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976). In Jewell, we held "(1) that the required knowledge is established if the accused is aware of a high probability of the existence of the fact in question, (2) unless he actually believes it does not exist." Id. at 704 n. 21, 96 S.Ct. at n. 21; see also United States v. Esquer-Gamez, 550 F.2d 1231, 1235-36 (9th Cir.1977).
 
 
 25
 In this case, the court's instruction allowed the jury to find knowledge merely on the basis that the defendant should have known that his statements were going to the government and hence were made in a matter within federal agency jurisdiction. It allowed the jury to convict Yermian even if it did not find that he was aware of a high probability that the statement was made in a matter within the jurisdiction of the government, or, indeed, even if it believed that he, in fact, did not know that his statement would be sent to the government.
 
 
 26
 The district court's judgment is, therefore, REVERSED and REMANDED.
 
 
 
 [1]
 18 U.S.C. Sec. 1001 (1976) states:
 Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 
 
 [2]
 In United States v. Rose, 570 F.2d 1358, 1363 (9th Cir.1978), this court enumerated the elements necessary for a conviction under 18 U.S.C. Sec. 1001; (1) a statement; (2) falsity; (3) specific intent; (4) materiality; and (5) agency jurisdiction. As the Rose court noted, in United States v. Bedore, 455 F.2d 1109, 1111 (9th Cir.1972), we had further limited the scope of Sec. 1001 to only those statements that either are related to a claim of the maker "to a privilege from the United States or to a claim against the United States" or "might pervert or corrupt the authorized functions of those agencies to whom the statements were made."
 
 
 [3]
 For example, in United States v. Kraude, 467 F.2d 37, 38 (9th Cir.), cert. denied, 409 U.S. 1076, 93 S.Ct. 684, 34 L.Ed.2d 684 (1974), where we held that the submission of false Medicare claims to a contractual agent of HEW was sufficient to support a conviction under Sec. 1001, we did not discuss the issue of defendant's knowledge of federal involvement, presumably because the defendant there must have known that Medicare is a federal program and hence that his false Medicare claims were made in a matter within the jurisdiction of a federal agency. Similarly, in Gilbert v. United States, 359 F.2d 285, 287 (9th Cir.), cert. denied, 385 U.S. 882, 87 S.Ct. 169, 17 L.Ed.2d 109 (1966), the issue of jurisdictional knowledge did not arise, since the defendant "certainly was aware that the endorsement of the [U.S.] checks was the first crucial step in their journey to the Treasury Department where they would be ultimately presented for payment." In Ogden v. United States, 303 F.2d 724, 728-32 (9th Cir.1962), a defense contractor employee raised, and the court addressed only a defense based on impropriety of the security clearance procedures and not one grounded on a lack of jurisdictional knowledge. See also Neely v. United States, 300 F.2d 67 (9th Cir.) (issue of jurisdictional knowledge not raised), cert. denied, 369 U.S. 864, 82 S.Ct. 1030, 8 L.Ed.2d 84 (1962); Brandow v. United States, 268 F.2d 559 (9th Cir.1959) (same); Pitts v. United States, 263 F.2d 353 (9th Cir.) (same), cert. denied, 360 U.S. 935, 79 S.Ct. 1457, 3 L.Ed.2d 1547 (1959); Cohen v. United States, 201 F.2d 386 (9th Cir.) (same), cert. denied, 345 U.S. 951, 73 S.Ct. 864, 97 L.Ed. 1374 (1953)
 
 
 [4]
 Although only four years before Baker the Fifth Circuit had stressed the existence of defendants knowledge of the "federal government's connection with ... [the false] affidavit" in sustaining a Sec. 1001 conviction, United States v. Lange, 528 F.2d 1280, 1287 n. 11 (5th Cir.1976), in its 1980 decision, the Fifth Circuit did not mention, let alone distinguish, Lange 's emphasis on the existence of the defendant's knowledge of federal involvement
 
 
 [5]
 The 1938 Act stated in pertinent part:
 [W]hoever shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, in any matter within the jurisdiction of any department or agency of the United States or of any corporation in which the United States of America is a stockholder ... shall be fined.
 Act of Apr. 4, 1938, ch. 69, 52 Stat. 197.
 
 
 [6]
 The inclusion of the word "knowing" in the third clause of Sec. 1001, which emphasizes that the defendant must know that a document he makes or uses contains a falsehood, sheds no light on whether jurisdictional knowledge is required, since the phrase "knowingly and willfully," appearing before all three clauses, remains to provide the basis for a requirement of knowledge of federal involvement pertaining to all three clauses
 
 
 [7]
 While discussing the purported policy and purposes behind Sec. 1001 in general terms, neither the Baker nor the Stanford court examined the legislative history of Sec. 1001 or its predecessor statutes. Baker, 626 F.2d at 515-16; Stanford, 589 F.2d at 297-98. The Lewis court, in its analysis of the legislative history of Sec. 1001, did little more than paraphrase a tangentially related Supreme Court case. 587 F.2d at 856-57
 
 
 [8]
 Previous to the 1918 Act, the making of a false statement was itself punishable as a federal crime only if the statement was made for the purpose of obtaining payment or approval of a federal claim and the federal claim was made or presented for payment to or approval by military personnel. See Act of March 4, 1909, ch. 321, 35 Stat. 1088, 1095-96 (1909)
 
 
 [9]
 The 1918 Act stated in pertinent part:
 [W]hoever, for the purpose of obtaining or aiding to obtain the payment of [a "claim upon or against the Government of the United States or any department or officer therefor, or any corporation in which the United States of America is a stockholder"], or for the purpose and with the intent of cheating and swindling or defrauding the Government of the United States or any department thereof, or any corporation in which the United States of America is a stockholder, shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statements or entry ... shall be fined.
 Act of Oct. 23, 1918, ch. 194, 40 Stat. 1015 (emphasis added).
 
 
 [10]
 The 1934 Act stated in pertinent part:
 [W]hoever shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, in any matter within the jurisdiction of any department or agency of the United States or of any corporation in which the United States of America is a stockholder ... shall be fined.
 Act of June 18, 1934, ch. 587, 48 Stat. 996.
 
 
 [11]
 Id
 
 
 [12]
 The convoluted legislative history of the 1934 Act began with the submission of proposed legislation by the Secretary of the Interior on February 7, 1934, to the House and Senate judiciary committees, which legislation was designed to penalize the "presentation of a false written instrument" in any matter within the jurisdiction of the Secretary. S.Rep. No. 288, 73d Cong., 2d Sess. 1 (1934); H.R.Rep. 829, 73d Cong., 2d Sess. 2 (1934). Drawing on the Secretary's proposal, each committee then reported similar bills to the floor, 78 Cong.Rec. 2387 (1934) (reporting S.R. 2686); id. at 3112 (reporting H.R. 8046), although the House committee had amended the language of the Secretary's proposal to include an element of intent to defraud the United States. Compare id. at 3724 (H.R. 8046) with id. at 2152, 2858-59 (S.R. 2686). After debate on and passage of each bill in its house of origin, id. at 2858-59 (S.R. 2686); id. at 3724-25 (H.R. 8046), the Senate requested the return of its bill from the House and adopted the earlier enacted House version, id. at 5746. President Roosevelt then vetoed H.R. 8046 solely on the ground that the bill would punish with lesser penalties certain conduct that was already punishable under the 1918 Act. Id. at 6778-79
 Within two months of the presidential veto, the Senate committee on the judiciary, abandoning H.R. 8046, reported amendments to another then unenacted bill, H.R. 8912, 73d Cong., 2d Sess. (1934), which had been designed to extend the 1918 Act to cover injury to U.S. property. The Senate amendments of H.R. 8912 further broadened the scope of the 1918 Act to punish also the presentation of false papers to a federal agency--even where no pecuniary loss to the government resulted--without lessening the penalties provided under the 1918 Act. 78 Cong.Rec. 9790 (1934) (submitting S.Rep. 1202, 73d Cong., 2d Sess. 1 (1934)). The bill as amended was passed by the Senate, id. at 11,270-71, and concurred in by the House, id. at 11,513. After examination and signing, id. at 11,559, 11,602, the bill was presented to, id. at 12,259, and signed by the President, id. at 12,452.
 H.R. 8912, as amended, being a modification of the previous 1918 Act rather than a newly drafted statute like H.R. 8046 or S.R. 2686, contains phrasing different from H.R. 8046 or S.R. 2686, upon which the 1934 House and Senate debates and committee consideration centered. Nonetheless, neither the Senate report that set forth the amendments to H.R. 8912 nor the brief Congressional proceedings accompanying the swift passage of H.R. 8912 as amended contain any indication whatsoever that the Congress, by substituting H.R. 8912 (the 1934 Act) for the previously passed but vetoed H.R. 8046, intended to alter any substantive aspect of the old bill--including the requisite elements of the offense--other than its lesser penalties and its provision for a specific intent to defraud the United States. Hence, the Congressional debates and committee reports pertaining to H.R. 8046 and S.R. 2686, while technically perhaps not part of the legislative history of the 1934 Act, nonetheless are directly indicative of the Congressional intent underlying the 1934 Act.
 
 
 [13]
 The existence on the form Yermian signed of a warning that a false statement violates Sec. 1001 is, of course, probative of Yermian's knowledge that he was making a statement in a matter within the jurisdiction of a federal agency, but is not, in and of itself, conclusive on the issue of specific intent. Contra Terry v. United States, 131 F.2d 40, 43 (8th Cir.1942) (defendant "by legal implication ... bound to know" from references on form to Federal Housing Administration that false statement was made in a matter within jurisdiction of federal agency)
 
 
 [14]
 Because of the similarity of Sec. 1001 to the perjury statute, 18 U.S.C. Sec. 1621 (1976), we find that the cases construing Sec. 1621 bolster our conclusions here. To convict under the perjury statute, the government must prove (1) that the defendant actually knew that his statement at the time he made it was false, United States v. Sweig, 441 F.2d 114, 117 (2d Cir.), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971), and (2) that the defendant made the statement under oath, United States v. Arias, 575 F.2d 253, 254 (9th Cir.), cert. denied, 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978). In the context of the perjury offense, the defendant's taking of an oath ensures that he knows that his false statement, unlike most other false statements he may have made, could possibly subject him to criminal prosecution
 The same principle applies with equal force in the context of Sec. 1001. To ensure that a person knows that the making of a false statement could subject him to criminal liability, the defendant must know at the time he makes the statement that the statement is made in a matter within the jurisdiction of the government. The making of a false statement to a private entity, without knowledge that the statement is made in a matter within the jurisdiction of a federal agency, does not fall within the strictures of Sec. 1001, even if the statement is in fact forwarded to the government.
 For similar reasons, we are not convinced by the reliance of the Stanford and Lewis courts on United States v. Feola, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). See Stanford, 589 F.2d at 297-98; Lewis, 587 F.2d at 857. In Feola, the Supreme Court held that 18 U.S.C. Sec. 111 (1976), which makes assault upon a federal officer a federal offense, does not include as an element of the offense the defendant's knowledge that the assaulted person is a federal officer. 420 U.S. at 684, 95 S.Ct. at 1263. However, unlike making a false statement, committing an assault is a crime--even apart from the federal statute--in every state of the Union. Hence, as the Supreme Court pointed out, Sec. 111 is "no snare for the unsuspecting," since one committing an assault "knows from the very outset that his planned course of conduct is wrongful" and because Sec. 111 does not create a "situation ... where legitimate conduct becomes unlawful solely because of the [federal] identity of the individual or agency affected." Id. at 685, 95 S.Ct. at 1264.
 
 
 [15]
 By contrast, a "subjective" knowledge standard requires proof that the defendant actually knew the pertinent fact