**UNITED STATES of America,**
**Plaintiff,**

v.

**Frank MUNOZ, Defendant.**

**Crim. No. 4-82688.**

United States District Court,
E. D. Michigan, S. D.

Sept. 18, 1974.

Michael D. Gladstone, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Neil H. Fink, Detroit, Mich., for defendant.

## OPINION AND ORDER DENYING MOTION TO QUASH INDICTMENT

KAESS, Chief District Judge.

There is presently before the Court a Motion to Quash Indictment. The basic premise underlying the motion relates to the language of the statute under which the defendant was indicted. Section 1001, Title 18, United States Code, provides:

"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than Ten Thousand Dollars ($10,000.00) or imprisoned nor more than five (5) years, or both. June 25, 1948, c. 645, 62 Stat. 749."

It is the contention of the defendant that the alleged violation, set forth in the indictment, is not a matter within the "jurisdiction" of any agency or department of the United States as is required by the statute.

A brief review of the facts is necessary to an understanding of the scope of the problem presented. The defendant is charged with making false statements to Detroit Jobs for Progress, Inc. (Detroit Jobs), and receiving funds from Detroit Jobs as a result of these false statements. Detroit Jobs is a nonprofit Michigan corporation, incorporated in 1970 for the purposes of designing, developing and implementing programs to alleviate the severe economic hardships of Mexican Americans and their hardcore unemployed. The funding of the corporation was to follow the general plan of solicitation from individual, business, organizational and governmental sources. As a practical matter, essentially all of the funds of Detroit Jobs resulted from a contractual relationship with National Jobs for Progress, Inc.

National Jobs for Progress, Inc. (National Jobs) is a national organization with goals similar to those of Detroit Jobs and incorporated in Texas. National Jobs had, in turn, established a contractual relationship with the Department of Labor pursuant to the Manpower Development and Training Act of 1962, 42 U.S.C. § 2571. This relationship resulted in the partial or total funding of the National Jobs operation. Stated in the most simple terms, Detroit Jobs was a subcontractor to National Jobs, who was a contractor to the Department of Labor.

Defendant Munoz had contracted with Detroit Jobs to employ and provide on-the-job training services for three (3) employees, for which he was to receive an amount not to exceed Five Thousand Forty Dollars ($5,040.00). Each alleged employee makes up one (1)-count of the three (3)-count indictment pending against the defendant.

The question before the Court, thus, becomes a simple one: Is Detroit Jobs within the jurisdiction of the Department of Labor?

Several Courts have been confronted with similar situations. In United States v. Kraude, 467 F.2d 37 (9th Cir.

1972), the defendant was a psychiatrist who had been convicted on eleven (11) counts of Section 1001 violations. The doctor had submitted false requests for medicare payments to an insurance company which was acting as a paying agent for the Social Security Administration. Part of the defendant's argument on appeal consisted of the fact that the false statements had been submitted to an agent and not the governmental agency itself and, therefore, was outside the scope of Section 1001. The Court dismissed this argument holding that the insurance company was an agent of the Department of Health, Education and Welfare for the specific purpose of disbursing funds and, therefore, within the jurisdiction of the Department of the United States.

In reaching its decision, the Court in *Kraude* relied on Ebeling v. United States, 248 F.2d 429 (8th Cir. 1957). In *Ebeling,* the defendant contended that false information supplied by a subcontractor to the defendant, who was under a contract to the Department of the Army, did not meet the jurisdictional requirement of Section 1001. Appellant argued that jurisdiction was lacking since no writing or document had been physically submitted to the agency or department for consideration, action or reliance.

As the Court noted:

"We do not believe that the term 'jurisdiction,' as related to the making or using of a false writing or document, is employed in this technical or limitative sense in the statute involved. Other courts have had occasion to consider the question and have held that § 1001 does not require that a false statement or document must itself have been presented to a department or agency of the United States but that it contemplates as well any knowing making or using of such a statement or document in intended relationship to a matter that is within the jurisdiction of the department or agency. See e. g. United States v. Myers, D.C.Cal., 131 F.Supp. 525, 530;

United States v. Giarraputo, D.C.N.Y., 140 F.Supp. 831, 834.

We agree. In more explicit terms, we are of the opinion that it constitutes a violation of § 1001, for anyone willfully to make or use a false writing or document, knowing that it contains a false, fictitious or fraudulent statement or entry, and intending that it shall bear a relation or purpose as to some matter which is within the jurisdiction of a department or agency of the United States, and with the false, fictitious or fraudulent statement or entry which it contains having a materiality on the department or agency matter." at 434

The situation in *Ebeling* is analogous to the present one in that the false statements were never directly transmitted to the Department of Labor. However, it does seem that such false and misleading statements would have a definite adverse effect on the relationships existing between both Detroit Jobs and National Jobs and National Jobs and the Labor Department. Such effect is admittedly strained in view of the contractual distance between the Department of Labor and defendant Munoz. However, in spite of this distance and the parties interposed between the defendant and the Department of Labor, it is not difficult to discern the effect that such false statements would have on both the information flowing back to the Department and the Department's disbursements of funds to the National Jobs organization.

At the evidentiary hearing on the motion, Mr. Gale Gibson, a ten (10-year employee of the Department of Labor, testified. He indicated that it was the philosophy of the Department of Labor, during the time period in question, to utilize the facilities of existing organizations to achieve certain objectives. It was this philosophy which led to the use of National Jobs for the disbursement of manpower funds. This arrangement was modified in 1973 so that the function of National Jobs was replaced by the regional offices of the Department

of Labor. This was modified later to place the funding of local programs under local control, i. e. the City of Detroit. Thus, it would appear that the National Jobs organization was used only as a temporary conduit for the funds of the Department of Labor.

Mr. Gibson further testified regarding the control exercised by the Department of Labor over the functions of National Jobs and Detroit Jobs. It was his testimony that the Labor Department could audit the books of both the National and Detroit operations to review the funds disbursed. He also testified that the Department received information on the Detroit Jobs' operation which Detroit Jobs had submitted to National Jobs. Apparently, the Department also had final authority over subcontracts entered into by National Jobs and also had a requirement that all government funds be segregated from other funds acquired by either National or Detroit Jobs.

This testimony would seem to indicate that the Department maintained a continuing interest in the funds even after they had been disbursed to National Jobs and, further, when National Jobs had disbursed down the line to local units. It is only reasonable to assume that a governmental agency would have a proper concern that ultimate objectives were being met. Counsel for the defendant contends that what the Department of Labor did was to "purchase" control over National Jobs by maintaining a tight reign over governmental pursestrings and that any jurisdiction ends with National Jobs. This Court cannot concur.

█ As the decisions referred to earlier note, the fraud need not be perpetrated directly on or to the governmental agency or department involved. The false statement need only relate to and effect a relationship within the jurisdiction of an agency or department of the United States. See *Ebeling, supra*; United States v. Candella, 487 F.2d 1223 (2d Cir. 1973).

Perhaps the most definitive discussion in regard to jurisdiction is found in Friedman v. United States, 374 F.2d 363 (8th Cir. 1967). Defendant Friedman had been convicted of a Section 1001 violation for giving false information to the Federal Bureau of Investigation. In reversing the conviction, the Eighth Circuit Court of Appeals discussed at length the purposes and scope of 18 U.S.C. § 1001. As that Court noted:

"In discussing jurisdiction, we must recognize the fundamental difference between the naked authority of a body to act and the power to make final or binding determinations. On one hand there exists a power to make monetary awards, grant governmental privileges, or promulgate binding administrative and regulative determinations. *From this 'jurisdiction' indicating a positive power, we must differentiate the mere authority to conduct an investigation in a given area without the power to dispose of the problems or compel action.*" at 367

The present situation is clearly distinguishable from that in *Friedman*, in that the Department of Labor does have more than an investigatory authority in dealing with its contractual relationships. In *Friedman*, the Federal Bureau of Investigation could only investigate; here, the Labor Department can terminate funds not only to National Jobs but also those going to Detroit Jobs through National.

If the scope of § 1001 were to be limited to the extent contended by defense counsel, the government would be without authority to prosecute except in instances where the fraud was directly perpetrated on the government agency itself. This imposes a too technical limitation on the scope of the statute. See Bryson v. United States, 396 U.S. 64, 70, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969). As the Court in *Friedman* noted:

"No one would deny the Government's right under the statute to protect itself from fraudulent claims and from those who are seeking the grant of

governmental privileges under false assertions. When the false statement is made to the agency with the power to allow the privilege or grant the award, jurisdiction of the agency is established so as to warrant a prosecution under § 1001. *Likewise, if the Government is to regulate, it must be able to protect its regulative functions from those who would utterly destroy those functions by presenting false information.* The statute was designed for this very purpose." at 369 (Emphasis added)

Thus, this Court must conclude that there is a sufficient nexus between the fraud allegedly perpetrated by defendant Munoz and the Department of Labor and its distribution of federal funds. Since the Department had the authority to regulate the use of the funds distributed, the false statement is within the "jurisdiction" of an agency or department of the United States.

Therefore, for the reasons set forth above, it is ordered that the Motion to Quash Indictment be and hereby is denied.